MISSOURI PAC. RY. Co. *v.* TEXAS & P. RY. Co., (WILLIAMS, Intervenor.)

*(Circuit Court, E. D. Louisiana.   April 12, 1890.)*

1. CARRIER—SHIPPING CATTLE—NEGLIGENCE.

In an action for damages to cattle from negligent handling by a railroad, it appeared that the cattle had been driven over 100 miles before they were shipped; that they were in poor condition, very wild, and hard to get on the cars; that some of them got down and were injured before they had been carried any considerable distance; and that they were loaded on the cars by plaintiff. *Held*, that the damage resulted from the condition of the cattle, and defendant was not liable.

2. SAME—STATUTORY DUTY TO FEED AND WATER.

Under Rev St. Tex. art. 284, which provides that it shall be the duty of the common carrier to feed and water live-stock during the time of conveyance, unless otherwise provided by special contract, the carrier is not liable, when it appears that it was agreed that plaintiff should water and feed the cattle, and the carrier was to stop for the purpose at a particular place, and there is no evidence that the carrier was requested to stop before reaching the place named.

3. SAME—WAIVER BY OWNER.

Under Rev. St. U. S. § 4386, which provides that no railroad shall confine live-stock in cars for more than 28 consecutive hours without unloading them for rest and feeding for at least 5 consecutive hours, the railroad is not liable when it appears that there was a special contract that the shipper should feed and water the live-stock, and there is no specific evidence as to amount of the damage from the failure to feed and water.

In Equity.   On exceptions to the master's report.   Intervention of H. G. Williams.

*Rice & Armstrong* and *John Dawler,* for intervenor.

*Howe & Prentiss,* for receiver.

PARDEE, J.   That intervenor's cattle suffered injuries and damages while in transit from Pecos to Willow Springs is not disputed.   The intervenor claims that the cause was negligence and bad handling on the part of the railroad company.   It is contended for the receiver that it was through the negligence of the intervenor and his employes, and on account of the poor condition of the stock at the time of shipment.   An examination of the evidence shows that the cattle were wintered in Presidio county, Tex.; were wild; a part had been herded four or five weeks, and some never herded; that they were gathered up and driven to Pecos, a distance of over a hundred miles, for shipment; that it was intended to ship them at Toya, but the agent of the intervenor testifies that, "on penning a portion of the cattle in the company' stock-pen at that place, nine head bogged down in the mud, and three of said cattle died before I could pull them out, and the other six were so exhausted that I lost them before I reached Pecos City, where I took the same for shipment;" that, in penning and loading the cattle for shipment, there was a great deal of trouble arising from the wildness of the cattle and their weak condition, about 13 hours being taken to load them on the trains.

The witnesses as to the condition of the stock at this time testify, substantially, as follows:   B. M. Jones, the agent of the intervenor: "The cattle were in average shipping condition."   Tom Hammond, an employe of intervenor, assisted in the loading, and went through to Willow Springs with the first train:   "Cattle in good condition; strong,

healthy, able to make the journey." As good cattle as he ever saw in Texas. Again: "They were all in first-class condition." Again: "The condition of these cattle when shipped was first-class. They were strong and healthy, and in good order, and were able to make the journey in the cars through the Indian Territory, if they had not been so crowded in the cars, and ordinary care had been used in the transportation." The testimony of this witness must evidently be taken with some allowance, because he puts the condition of the cattle as much better than claimed by the owner. W. D. Johnson, stockman, of Pecos, Tex: "Some of them were thin in order, but all seemed to be in good health, and strength enough to travel. They were straight Mexican cattle, and were very wild." James Cooksy, stock-raiser, Toya: "I helped try to pen them at Toya, but could not get them in the pen. They were poor, but were in traveling condition; able, if properly loaded, to stand the journey." T. B. Thompson, employe of the intervenor: "Cattle were poor, weak, and I didn't think they were able to make the journey." S. D. McWhorter, an employe of the railroad company at Pecos, in his deposition: "The cattle were in medium condition, neither fat nor poor. They had never been handled before, and were very difficult to load in cars." In connection with this witness' testimony it may be noticed that there is a letter of his in the record, written April 6, 1889, in which he says that he "superintended the loading of said cattle; that the cattle were in fair condition, but were very weak. They had never been handled until Williams' men began to gather them, and wouldn't graze or drink scarcely at all after they were put under herd; and at the time they were driven here were very weak, being so obstinate and unruly that when they were unloaded they were exhausted, and would not try to help themselves on. On the first train loaded, we were about four hours loading them, to the best of my recollection. On the next train, we began loading about 9 P. M., and worked all night, and didn't get them loaded until 6 or 6:30 A. M. In the mean time, some of the cattle got down in one of the loaded cars. We had to unload it to get them up. Two or three—only two, I think—were smothered before we could get to them. Some of them were so obstinate that we had to lariat and drag them from the car, and some of them were down before the train left the station. I never yet had to contend with as mean a lot of bastards as they were." G. Farnham, conductor of one of the trains: "This train of stock was in exceedingly poor condition. There were five head of cattle left at the Colorado stock-yards by the consent of the party in charge of said cattle. They were left because they were too poor to be reloaded. They were not too heavily loaded; but were too poor to be shipped, and were too weak to stand up any length of time. This was the cause of the whole trouble." In his official report attached to his deposition, he reports the condition of the stock "very poor." F. L. Linder, a conductor in charge of train: "I don't know of any stock being injured while in my charge. From my observation, they arrived in Big Springs in good condition, and without any being down or injured." Reference to the number of cars show that Farnham's and Linder's re-

ports were for different trains.    I. N. Cole, freight conductor, in charge of one train: "The cattle on said train were in very poor shipping condition; many of them too poor to stand on their feet.  Everything possible was done to keep said cattle on their feet, but they were in such poor condition that it was impossible." In his official report, he said: "The cattle in this train were in very poor shipping condition; many of them too poor to stand on their feet.  Parties in charge did what they could to keep them up, but couldn't do so.  No unusual delay."  This conductor was in charge of one train from Baird to Fort Worth.  C. M. Elliott, conductor on freight train from Big Springs to Baird: "I have no memorandum showing the exact condition of said cattle when I received them; only know that they were in weak and poor condition when I received them at Big Springs.  The attached statement shows the condition of said cattle when I left them."  The attached statement shows that, in five of the cars, the condition of the stock was good; in all of the others of the train it was bad.  This report is signed by the employes of the intervenor in charge of the stock.  J. M. Wyse, foreman of railroad yards at Fort Worth: "They were in very poor condition, caused from starvation, I should judge."  Attached exhibits showing one train, general condition of stock, "Fair;" another train, "Bad shape; very poor and weak."

The decided preponderance of the evidence given by these witnesses is that the stock was in poor condition when loaded on the cars at Pecos, and many of them unfit to take the journey.  This evidence is corroborated by the undisputed facts in the case, to-wit:  That great trouble was had in loading the cattle on the cars; that many got down and were injured before they had been carried any distance, and by the presumption arising from the fact that the cattle were wild, and had been driven from 100 to 150 miles before reaching the place of shipment.  The conclusion that I reach in the matter is that the damage to intervenor's cattle grew out of the poor condition of the stock; and a further examination of the case satisfies me that it in no wise resulted from overloading in the cars, or from bad handling of the train.  In fact, the testimony of Mr. Jones, the agent of intervenor, who loaded the cattle, is conclusive to my mind that the cars were not overloaded.  Under the special contract made in the case between the parties, the loading of the cattle in the cars was to be done by the shipper, who, by himself or by his agents, indicated the number of cattle to be put in each car.  The transportation was by the car-load, and not per head of cattle, and, consequently, the more cattle put in a car the greater the shipper's advantage.  Mr. Jones testifies on the subject as follows:

"There were twenty-eight car-loads of cattle and three cars of horses.  A man, whose name I don't know, attended to the loading of said cattle on the part of the railroad company.  I presume he was the yard-master of the road, and he sat on top of the car, and counted the cattle as they went in.  Said cars were loaded according to the size of the cars, from twenty-two to twenty-five head in each car.  I have had a good deal of experience in shipping cattle over railroads.  I think I am competent to judge of the number to be put in a car for shipment.  I think the number I put in was the proper num-

ber, and as stated above. Said cattle were properly loaded, and were not too much crowded to travel with ease and safety. I paid for cars in accordance with the length of the cars."

The evidence shows that one of the trains loaded with cattle ran from Pecos to Fort Worth in less than 28 hours, and that the other took some hours over. The cattle were not unloaded for feeding and watering between Pecos and Fort Worth. It is extremely probable that the bad condition of the cattle at the time of shipment was aggravated by this long trip without food or water. How much this contributed to the injury of the stock does not appear. According to the testimony of Jones, the agreement with the company was that the cattle were to be run through to Fort Worth, and there unloaded and fed; and in pursuance thereof he testifies that he prepaid freights, and also for feeding said cattle at Fort Worth. The special contract, produced on the hearing, stipulates that "the shipper, at his own risk and expense, is to take care of, feed, water, and attend to the said stock, while the same is being loaded, transported, unloaded, and reloaded."

Article 284 of the Revised Statutes of Texas provides that "it shall be the duty of a common carrier, who conveys live-stock of any kind, to feed and water the same during the time of conveyance, and until the same is delivered to the consignee, or disposed of as provided in this title, unless otherwise provided by special contract." As there was a special contract in this case (1) that the cattle were to be fed and watered at Fort Worth; and (2) that the shipper was to take care of, feed, water, and attend to said stock; and as there is no evidence in the record, or even pretense on the part of the intervenor, that he or his agent called on the carrier to stop for feed and water at any other place than at Fort Worth,— it would seem that the carrier is excused from responsibility for any damage resulting from the failure to feed and water the cattle between Pecos and Fort Worth.

Section 4386 of the Revised Statutes of the United States provides:

"No railroad company within the United States, whose road forms any part of a line of road over which cattle, sheep, swine, or other animals are conveyed from one state to another, * * * shall confine the same in cars * * * for a longer period than twenty-eight consecutive hours, without unloading the same for rest, water, and feeding, for a period of, at least, five consecutive hours, unless prevented from so unloading by storm or other accidental causes."

One of the trains carrying intervenor's cattle went through to Fort Worth in less than 28 hours; one was over 28 hours. The cause for the delay is not apparent. It is easy to imagine, however, that it was the result of accident. If there had been no special contract between the parties, as authorized by the law of Texas in regard to this matter, it would seem that under the United States statute, above quoted, the carrier was in fault as to one of these trains, and that the fault resulted in damage; but considering the special contract, and the fact that the evidence is not sufficiently specific to enable the court to assess the damage arising from failure to feed and water, I am of the opinion that the intervenor can

take nothing on that score. And on the whole case, as made by the evidence, I am of the opinion that the master's report, so far as the cattle in question are concerned, should be sustained.

It seems that, in the shipment of stock, there were three car-loads of horses, all of which arrived at the destination, and were delivered in good condition, except two, which were short. They are not accounted for in any way by the evidence in the case. Their value, from the testimony of witnesses, runs from $30 to $50 each. I think $75 for the two would be a fair valuation. This amount the intervenor should recover. The master's report will be so amended as to recommend payment of $75 to the intervenor for the two horses claimed, and thereupon all exceptions will be overruled, and the master's reported confirmed and approved. The costs of the clerk, marshal, and special master, in and about this intervention, will be paid by the receiver. The master's compensation is fixed at $75.